09-3804-cv
Gray v. Citigroup, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2010
(Argued: September 28, 2010      Decided: October 19, 2011)
Docket No. 09-3804-cv

------------------------------------------------------------x

IN RE: CITIGROUP ERISA LITIGATION

------------------------------------------------------------x

STEPHEN GRAY, JAMES BOLLA, and SAMIER TADROS,

Lead Plaintiffs-Appellants,

SANDRA WALSH, ANTON K. RAPPOLD, and ALAN STEVENS,

Plaintiffs-Appellants,

-- v. --

CITIGROUP INC., CITIBANK, N.A., THE PLANS
ADMINISTRATION COMMITTEE, THE PLANS INVESTMENT
COMMITTEE, CHARLES O. PRINCE, ROBERT E. RUBIN, JORGE
BERMUDEZ, MICHAEL BURKE, STEVE CALABRO, LARRY JONES,
FAITH MASSINGALE, THOMAS SANTANGELO, ALISA SEMINARA,
RICHARD TAZIK, JAMES COSTABILE, ROBERT GROGAN, ROBIN
LEOPOLD, GLENN REGAN, CHRISTINE SIMPSON, TIMOTHY
TUCKER, LEO VIOLA, DONALD YOUNG, MARCIA YOUNG, and JOHN
DOES 1-20,

Defendants-Appellees.

------------------------------------------------------------x

B e f o r e :  WALKER, CABRANES, and STRAUB, Circuit Judges.

Plaintiffs, participants in retirement plans offered by

defendants Citigroup Inc. and Citibank, N.A., and covered by the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., appeal from a judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, Judge) dismissing their ERISA class action complaint. Plan documents required that a stock fund consisting primarily of Citigroup common stock be offered among the plans' investment options. Plaintiffs argue that because Citigroup stock became an imprudent investment, defendants should have limited plan participants' ability to invest in it. We hold that plan fiduciaries' decision to continue offering participants the opportunity to invest in Citigroup stock should be reviewed for an abuse of discretion, and we find that they did not abuse their discretion here. We also hold that defendants did not have an affirmative duty to disclose to plan participants nonpublic information regarding the expected performance of Citigroup stock, and that the complaint does not sufficiently allege that defendants, in their fiduciary capacities, made any knowing misstatements regarding Citigroup stock. AFFIRMED.

Judge STRAUB dissents in part and concurs in part in a separate opinion.

MARC I. MACHIZ, Cohen Milstein Sellers & Toll PLLC, Philadelphia, PA (Robert I. Harwood, Samuel K. Rosen, Tanya Korkhov, Harwood Feffer LLP, New York, NY; Marian P. Rosner, Andrew E. Lencyk, James Kelly-Kowlowitz, Wolf Popper LLP, New York, NY, on the brief), for Plaintiffs-Appellants.

LEWIS RICHARD CLAYTON, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY (Brad S. Karp, Susanna Michele Buergel, Douglas M. Pravda, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Lawrence B. Pedowitz, Jonathan M. Moses, John F. Lynch, Wachtell, Lipton, Rosen & Katz, New York, NY, on the brief), for Defendants-Appellees.

THOMAS TSO, Attorney (Deborah Greenfield, Acting Deputy Solicitor of Labor, Timothy D. Hauser, Associate Solicitor for Plan Benefits Security, Elizabeth Hopkins, Counsel for Appellate and Special Litigation, on the brief), United States Department of Labor, Washington, DC, for amicus curiae Hilda L. Solis, Secretary of the United States Department of Labor.

JAY E. SUSHELSKY, AARP Foundation Litigation, Washington, DC (Melvin Radowitz, AARP, Washington, DC), for amicus curiae AARP.

ELLEN M. DOYLE, Stember Feinstein Doyle & Payne, LLC, Pittsburgh, PA (Rebecca M. Hamburg, National Employment Lawyers Association, San Francisco, CA; Jeffrey Lewis, Lewis, Feinberg, Lee, Renaker & Jackson P.C., Oakland, CA), for amicus curiae National Employment Lawyers Association.

3

IRA G. ROSENSTEIN, Orrick, Herrington & Sutcliffe LLP, New York, NY (Ira D. Hammerman, Kevin M. Carroll, Securities Industry and Financial Markets Association, Washington, DC; Joseph Liburt, Orrick, Herrington & Sutcliffe LLP, Menlo Park, CA), for amicus curiae Securities Industry and Financial Markets Association.

CHARLES C. JACKSON, Morgan, Lewis & Bockius, LLP, Chicago, IL (David Ackerman, Morgan, Lewis & Bockius, LLP, Chicago, IL; John A. Kober, Morgan, Lewis & Bockius LLP, New York, NY; Jamie M. Kohen, Morgan, Lewis & Bockius, LLP, New York, NY), for amicus curiae ESOP Association.

THOMAS L. CUBBAGE III (John M. Vine), Covington & Burling LLP, Washington, DC, for amicus curiae ERISA Industry Committee and American Benefits Council.

JOHN M. WALKER, JR., Circuit Judge:

Plaintiffs, participants in retirement plans offered by defendants Citigroup Inc. and Citibank, N.A., and covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., appeal from the judgment of the United States District Court for the Southern District of New York (Sidney H. Stein, Judge) dismissing their ERISA class action complaint.[1]

---

[1] This case was argued in tandem with Gearren v. McGraw-Hill Cos., Nos. 10-0792, 10-0934, which we resolve in a separate opinion filed today.

Plan documents required that a stock fund consisting primarily of employer stock (the Citigroup Common Stock Fund) be offered among the investment options. Plaintiffs allege that, because Citigroup stock became an imprudent investment, defendants' failure to limit plan participants' ability to invest in the company violated ERISA. We hold that the plan fiduciaries' decision to continue offering participants the opportunity to invest in Citigroup stock should be reviewed for an abuse of discretion, and we find that they did not abuse their discretion here. We also hold that defendants did not have any affirmative duty to disclose to plan participants nonpublic information regarding the expected performance of Citigroup stock, and that the complaint does not sufficiently allege that defendants, in their fiduciary capacities, made any knowing misstatements to plan participants regarding Citigroup stock. We therefore AFFIRM the district court's dismissal of plaintiffs' complaint.

**BACKGROUND**

**I.   Factual Background**

Plaintiffs are participants in the Citigroup 401(k) Plan (the "Citigroup Plan") or the Citibuilder 401(k) Plan for Puerto Rico (the "Citibuilder Plan") (collectively, the "Plans"). These employee pension benefit plans are governed by ERISA, which

characterizes them as "eligible individual account plans."[2]  29 U.S.C. § 1107(d)(3); see also 29 U.S.C. § 1002(2)(A) (defining "employee pension benefit plan").  Defendant Citigroup Inc. ("Citigroup"), a Delaware corporation and financial services company, is the sponsor of the Citigroup Plan. Defendant Citibank, N.A. ("Citibank"), a subsidiary of Citigroup, is the sponsor of the Citibuilder Plan and the trustee of the Citigroup Plan. The Citibuilder Plan's trustee – not a defendant in this action - is Banco Popular de Puerto Rico. Each Plan is managed by the same two committees:  the "Administration Committee," consisting of eight members, charged with administering the Plans and construing the Plans' terms, and the "Investment Committee," consisting of ten members, responsible for selecting the investment fund options offered to Plan participants.

The Citigroup Plan is offered to Citigroup employees, and the Citibuilder Plan is offered to Puerto Rico employees of Citibank.  In all material respects, the Plans are the same. Participants in each Plan may make pre-tax contributions, up to a certain percentage of their salary, to individual retirement accounts.  The participants are then free to allocate the funds

---

[2]    An eligible individual account plan is a defined contribution plan that is "(i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which . . . [is] invested primarily in qualifying employer securities."  29 U.S.C. § 1107(d)(3)(A).

within their accounts among approximately 20 to 40 investment options selected by the Investment Committee. Both Plans state that participants' accounts are to be invested in these investment options "in the proportions directed by the Participant."

The Citigroup Common Stock Fund (the "Stock Fund" or the "Fund") is an investment option offered by both Plans, which define the Fund as "an Investment Fund comprised of shares of Citigroup Common Stock." By offering the Stock Fund, the Plans provide a vehicle that enables Plan participants to invest in the stock of their employer. The Plans also authorize the Fund to "hold cash and short-term investments in addition to shares of Citigroup Common Stock," "[s]olely in order to permit the orderly purchase of Citigroup Common Stock in a volume that does not disrupt the stock market and in order to pay benefits hereunder."

Both Plans mandate that the Fund be included as an investment option. Section 7.01 of each provides that the Plan trustee "shall maintain, within the Trust, the Citigroup Common Stock Fund and other Investment Funds," and section 7.01 of the Citigroup Plan adds that "the Citigroup Common Stock Fund shall be permanently maintained as an Investment Fund under the Plan." Section 7.09(e) of each Plan states that "provisions in the Plan mandate the creation and continuation of the Citigroup Common Stock Fund." Further, section 15.06(b) of the Citigroup Plan

7

requires that the Trustee "maintain at least 3 Investment Funds in addition to the Citigroup Common Stock Fund."

**II.  Procedural History**

Plaintiffs filed their Consolidated Class Action Complaint on September 15, 2008, following a sharp drop in the price of Citigroup stock that began in late 2007 and continued into 2008. Citigroup, Citibank, and the Administration and Investment Committees are all defendants, as are Charles Prince ("Prince"), Citigroup's CEO from 2003 through November 2007, and each member of Citigroup's Board of Directors (with Prince, the "Director Defendants").  Plaintiffs challenge defendants' management of the Plans and, in particular, the Stock Fund.  Plaintiffs represent a putative class of participants in or beneficiaries of the Plans who invested in Citigroup stock from January 1, 2007 through January 15, 2008 (the "Class Period"), during which Citigroup's share price fell from $55.70 to $26.94.

Plaintiffs allege that Citigroup's participation in the ill-fated subprime-mortgage market caused the price drop during the Class Period.  Citigroup, according to plaintiffs, consistently downplayed its exposure to that market, even as it recognized the need to start reducing its subprime-mortgage exposure in late 2006.  At the end of 2007, Citigroup publicly reported a subprime-related loss of $18.1 billion for the fourth quarter, and further substantial losses continued through 2008.

Count I of the Complaint (the "Prudence Claim") alleges that the Investment Committee, the Administration Committee, Citigroup, and Citibank breached their fiduciary duties of prudence and loyalty by refusing to divest the Plans of Citigroup stock even though Citigroup's "perilous operations tied to the subprime securities market" made it an imprudent investment option. Plaintiffs argue that a prudent fiduciary would have foreseen a drop in the price of Citigroup stock and either suspended participants' ability to invest in the Stock Fund or diversified the Fund so that it held less Citigroup stock. Count II (the "Communications Claim") alleges that Citigroup, the Administration Committee, and Prince breached their fiduciary duties by failing to provide complete and accurate information to Plan participants regarding the Fund and its exposure to the risks associated with the subprime market.

Counts III-VI, in substance, are derivative of the violations alleged in Counts I and II. Count III alleges that Citigroup and the Director Defendants failed to properly monitor the fiduciaries that they appointed; Count IV alleges that the same defendants, who had some authority to appoint members of the Administration and Investment Committees, failed to disclose necessary information about Citigroup's financial status to these members; Count V alleges that all defendants breached their fiduciary duty of loyalty by putting the interests of Citigroup

9

and themselves above the interests of Plan participants; and Count VI alleges that Citigroup, Citibank, and the Director Defendants are liable as co-fiduciaries for the actions of their co-defendants.

On August 31, 2009, the district court granted in full defendants' motion to dismiss. In re Citigroup ERISA Litig., No. 07-cv-9790, 2009 WL 2762708 (S.D.N.Y. Aug. 31, 2009). The district court held that plaintiffs failed to state a claim against defendants related to the Plans' continued investment in Citigroup stock because "defendants had no discretion whatsoever to eliminate Citigroup stock as an investment option, and defendants were not acting as fiduciaries to the extent that they maintained Citigroup stock as an investment option." Id. at *8 (internal citation omitted). The district court found, alternatively, that even if defendants did have discretion to eliminate Citigroup stock, they were entitled to a presumption that investment in the stock, in accordance with the Plans' terms, was prudent and that the facts alleged by plaintiffs, even if proven, were insufficient to overcome this presumption. Id. at *15-19. As for the Communications Claim, the district court held that defendants had no duty to disclose information about Citigroup's financial condition and that any alleged misstatements made by defendants were either not knowingly false or not made by defendants acting in their fiduciary capacities.

10

Id. at *20-25. The district court also dismissed plaintiffs' claims regarding defendants' failure to monitor Plan fiduciaries, failure to disclose information to co-fiduciaries, and breach of the duty of loyalty. Id. at *25-27.

Plaintiffs now appeal from the district court's judgment dismissing the complaint.

**DISCUSSION**

We review de novo a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). See, e.g., Maloney v. Soc. Sec. Admin., 517 F.3d 70, 74 (2d Cir. 2008). We accept as true the facts alleged in the complaint, and may consider documents incorporated by reference in the complaint and documents upon which the complaint "relies heavily." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

ERISA's central purpose is "to protect beneficiaries of employee benefit plans." Slupinski v. First Unum Life Ins. Co., 554 F.3d 38, 47 (2d Cir. 2009). The statute does so by imposing fiduciary duties of prudence and loyalty on plan fiduciaries. The duty of prudence requires that fiduciaries act "with the

11

care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The duty of loyalty requires fiduciaries to act "solely in the interest" of plan participants and beneficiaries. Id. § 1104(a)(1).

A person is only subject to these fiduciary duties "to the extent" that the person, among other things, "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).  As a result, "a person may be an ERISA fiduciary with respect to certain matters but not others." Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 28 (2d Cir. 2002) (quoting F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1259 (2d Cir. 1987)).  Therefore, in suits alleging breach of fiduciary duty, the "threshold question" is whether the defendants were acting as fiduciaries "when taking the action subject to complaint."  Pegram v. Herdrich, 530 U.S. 211, 226 (2000).

In their Prudence Claim, plaintiffs allege that the Investment Committee, the Administration Committee, Citigroup, and Citibank violated their duties of prudence and loyalty by

12

continuing to offer the Stock Fund as an investment option and by refusing to divest the Fund of Citigroup stock. Plaintiffs' Communications Claim alleges that Citigroup, Prince, and the Administration Committee violated their duties of prudence and loyalty by failing to provide participants with complete and accurate information about Citigroup's financial status. For the reasons that follow, we agree with the district court that plaintiffs have failed to state a claim for relief as to any defendant.

**I.   Prudence Claim**

While plaintiffs bring the Prudence Claim against the Investment Committee, the Administration Committee, Citigroup, and Citibank, only the Investment Committee and Administration Committee were fiduciaries with respect to plaintiffs' ability to invest through the Plan in Citigroup stock. The Plans delegated to the Investment Committee the authority to add or eliminate investment funds, and the Plans delegated to the Administration Committee the authority to impose timing and frequency restrictions on participants' investment selections. Citigroup and Citibank, by contrast, lacked the authority to veto the Investment Committee's investment selections. Plaintiffs nevertheless allege that Citigroup and Citibank acted as "de facto fiduciaries" with respect to investment selection. Plaintiffs allege that Citigroup had "effective control over the

13

activities of its officers and employees" on the Investment and Administration Committees, but do not provide any example of this "effective control," nor do they suggest what actions Citigroup took as a de facto fiduciary.  Similarly, plaintiffs do not provide any description whatsoever of how Citibank "retained" certain duties delegated under the Citibuilder Plan to the Investment and Administration Committees.

However, even if we assume that each of the defendants – and not just the Investment Committee - was a fiduciary for investment-selection purposes, plaintiffs' claims are still met with two obstacles: (1) the Plan language mandating that the Stock Fund be included as an investment option and (2) the "favored status Congress has granted to employee stock investments in their own companies." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 308 (5th Cir. 2007).  These obstacles lead us to conclude that the Investment and Administration Committees' decisions not to  divest the Plans of Citigroup stock or impose restrictions on participants' investment in that stock are entitled to a presumption of prudence and should be reviewed for an abuse of discretion, as opposed to a stricter standard. We hold that plaintiffs have not alleged facts that would establish such an abuse.

    A.    A Presumption of ERISA Compliance in Employee Stock Ownership Plans and Eligible Individual Account Plans

14

Plaintiffs' claims place in tension two of ERISA's core goals: (1) the protection of employee retirement savings through the imposition of fiduciary duties and (2) the encouragement of employee ownership through the special status provided to employee stock ownership plans ("ESOPs") and eligible individual account plans ("EIAPs").[3] Congress enacted ERISA to "protect[] employee pensions and other benefits." Varity Corp. v. Howe, 516 U.S. 489, 496 (1996). As many courts have recognized, however, ESOPs, by definition, are "designed to invest primarily in qualifying employer securities," 29 U.S.C. § 1107(d)(6)(A), and therefore "place[] employee retirement assets at much greater risk than does the typical diversified ERISA plan," Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992); see also Quan v. Computer Scis. Corp., 623 F.3d 870, 879 (9th Cir. 2010) (citing the "tension" between the duty of prudence and Congress's preference for employees' investment in employer stock). Due to the risk inherent in employees' placing their retirement assets in a single, undiversified stock fund, Congress has expressed concern that its goal of encouraging employee ownership of the

---

[3] An ESOP is a type of EIAP. 29 U.S.C. § 1107(d)(3)(A). Because EIAPs, like ESOPs, "promote investment in employer securities, they are subject to many of the same exceptions that apply to ESOPs." Edgar v. Avaya, Inc., 503 F.3d 340, 347 (3rd Cir. 2007). We therefore agree with the district court that "nearly all of the points made about [ESOPs' encouragement of employer-stock ownership] apply equally to EIAPs." In re Citigroup ERISA Litig., 2009 WL 2762708, at *11 n.5.

15

company's stock could "be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans."  Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1520, 1590.  Accordingly, Congress has encouraged ESOP creation by, for example, exempting ESOPs from ERISA's "prudence requirement (only to the extent that it requires diversification)" and from the statute's "strict prohibitions against dealing with a party in interest, and against self-dealing."  Moench v. Robertson, 62 F.3d 553, 568 (3d Cir. 1995).

ERISA requires that fiduciaries act "in accordance with the documents . . . governing the plan insofar as such documents . . . are consistent with the provisions of [ERISA]."  29 U.S.C. § 1104(a)(1)(D).  The Act does not, however, explain when, if ever, plan language requiring investment in employer stock might become inconsistent with the statute's fiduciary obligations, such that fiduciaries would be required to disobey the requirements of the ESOP and halt the purchase of, or perhaps even require the sale of, the employer's stock.

The Third, Fifth, Sixth, and Ninth Circuits have addressed this question, and we find their decisions helpful.  The Third Circuit, in Moench v. Robertson, 62 F.3d 553 (3rd Cir. 1995), adopted a presumption of compliance with ERISA when an ESOP fiduciary invests assets in the employer's stock.  There, a

16

participant in an ESOP challenged the ESOP's continued investment in employer stock after the stock's share price dropped from $18.25 per share to $0.25 per share over a two-year period. Id. at 557. The court noted that while "ESOPs, unlike pension plans, are not intended to guarantee retirement benefits," id. at 568, "ESOPs are covered by ERISA's stringent requirements, and [except for in enumerated circumstances not directly applicable here] ESOP fiduciaries must act in accordance with the duties of loyalty and care," id. at 569. The court proceeded to describe the standard  by which it would judge an ESOP fiduciary's refusal to divest an ESOP of employer stock:

> [A]n ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities.

Id. at 571. The court remanded the case to the district court for a summary judgment determination under this new standard. Id. at 572. More recently, the Third Circuit expanded this rule to include situations where, as here, an employer stock fund is one of many investment options in an EIAP. See Edgar v. Avaya, Inc., 503 F.3d 340, 347-48 (3d Cir. 2007) ("[W]e conclude that the District Court correctly determined that Moench's abuse of discretion standard governs judicial review of defendants' decision to offer the Avaya Stock Fund as an investment option.").

17

The Sixth, Fifth, and Ninth Circuits have all adopted the Moench presumption. In Kuper v. Iovenko, 66 F.3d 1447 (6th Cir. 1995), the employer's stock price had dropped from more than $50 per share to just over $10 per share. Id. at 1451. The court "agree[d] with and adopt[ed] the Third Circuit's holding that a proper balance between the purpose of ERISA and the nature of ESOPs requires that we review an ESOP fiduciary's decision to invest in employer securities for an abuse of discretion." Id. at 1459. A failure to properly investigate the prudence of continued investment in employer stock could not alone overcome the presumption; rather, plaintiffs were required to demonstrate that conducting such an investigation "would have revealed to a reasonable fiduciary that the investment at issue was improvident." Id. at 1460. The Fifth and Ninth Circuits have also applied the presumption to situations in which employer stock funds were offered as investment options within EIAPs. See Kirschbaum v. Reliant Energy, Inc., 526 F.3d 243, 254 (5th Cir. 2008) ("The Moench presumption . . . applies to any allegations of fiduciary duty breach for failure to divest an EIAP or ESOP of company stock."); Quan v. Computer Scis. Corp., 623 F.3d 870, 881 (9th Cir. 2010) (adopting the presumption because it "is consistent with the statutory language of ERISA and the trust principles by which ERISA is interpreted"). No court of appeals has rejected the presumption of prudence.

18

We now join our sister circuits in adopting the <u>Moench</u> presumption – and do so with respect to both EIAPs and ESOPs – because, as those courts have recognized, it provides the best accommodation between the competing ERISA values of protecting retirement assets and encouraging investment in employer stock. An ESOP or EIAP fiduciary's decision to continue to offer plan participants the opportunity to invest in employer stock should therefore be reviewed for an abuse of discretion. This presumption may be rebutted if an EIAP or ESOP fiduciary abuses his discretion in continuing to offer plan participants the opportunity to invest in employer stock. We endorse the "guiding principle" recognized in <u>Quan</u> that judicial scrutiny should increase with the degree of discretion a plan gives its fiduciaries to invest. <u>See</u> <u>Quan</u>, 623 F.3d at 883 (citing <u>Kirschbaum</u>, 526 F.3d at 255 & n.9). Thus a fiduciary's failure to divest from company stock is less likely to constitute an abuse of discretion if the plan's terms require – rather than merely permit – investment in company stock.

We reject plaintiffs' argument – endorsed by the dissent – that we should analyze the decision to offer the Stock Fund as we would a fiduciary's decision to offer any other investment option. We agree with the Sixth and Ninth Circuits that were it otherwise, fiduciaries would be equally vulnerable to suit either for not selling if they adhered to the plan's terms and the

19

company stock decreased in value, or for deviating from the plan by selling if the stock later increased in value. See Kirschbaum, 526 F.3d at 256 n.13; Quan, 623 F.3d at 881. Such a result would be particularly troublesome in light of the "long-term horizon of retirement investing," which "requires protecting fiduciaries from pressure to divest when the company's stock drops." Quan, 623 F.3d at 882 (quoting Kirschbaum, 526 F.3d at 254). Also, as a general matter, plaintiffs' proposal fails to adequately account for Congress's concern that employees' ability to invest in employer stock would be endangered were courts to apply ERISA to ESOPs and EIAPs in the same way they apply the statute to other retirement plans. See, e.g., Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1583, 1590 (expressing the concern that treating ESOP plans as conventional retirement plans will "block the establishment and success of these plans").

The dissent argues that, rather than providing an "accommodation" between competing interests, our adoption of the Moench presumption allows the policies favoring ESOPs to "override the policies of ERISA." Dissent at **[11]**. The "policy concerns" we cite today do not, in Judge Straub's view, justify the adoption of a standard of review that "renders moot ERISA's 'prudent man' standard of conduct." Id. at **[4, 10]**. We emphasize in response that, more than simply accommodating

20

competing policy considerations, the Moench presumption balances the duty of prudence against a fiduciary's explicit obligation to act in accordance with plan provisions to the extent they are consistent with ERISA. See 29 U.S.C. § 1104(a)(1)(D). When, as here, plan documents define an EIAP as "comprised of shares of" employer stock, and authorize the holding of "cash and short-term investments" only to facilitate the "orderly purchase" of more company stock, the fiduciary is given little discretion to alter the composition of investments. If we were to judge that fiduciary's conduct using the same standard of review applied to fiduciaries of typical retirement plans, we would ignore not only the policy considerations articulated by Congress but also the very terms of the plan itself. Our endorsement of Moench is therefore based not on "indefensible policy concerns," Dissent at **[16]**, but on a recognition of the competing obligations imposed on ERISA fiduciaries.

The district court also ruled that defendants were insulated from liability because they had no discretion to divest the Plans of employer stock. In re Citigroup ERISA Litig., 2009 WL 2762708, at *13. We take issue with this holding because such a rule would leave employees' retirement savings that are invested in ESOPs or EIAPs without any protection at all – a result that Congress sought to avoid in enacting ERISA. See Kuper, 66 F.3d at 1457 ("[T]he purpose of ESOPs cannot override ERISA's goal of

21

ensuring the proper management and soundness of employee benefit plans."). Especially in light of ERISA's requirement that fiduciaries follow plan terms only to the extent that they are consistent with ERISA, 29 U.S.C. § 1104(a)(1)(D), we decline to hold that defendants' decision to continue to offer the Stock Fund is beyond our power to review.

Finally, we reject plaintiffs' argument that the Moench presumption should not apply at the pleading stage. The "presumption" is not an evidentiary presumption; it is a standard of review applied to a decision made by an ERISA fiduciary. Where plaintiffs do not allege facts sufficient to establish that a plan fiduciary has abused his discretion, there is no reason not to grant a motion to dismiss. See Edgar, 503 F.3d at 349 (applying Moench to grant a motion to dismiss because there was "no reason to allow [the] case to proceed to discovery when, even if the allegations [were] proven true, [the plaintiff could not] establish that defendants abused their discretion"); Gearren v. The McGraw-Hill Cos., Inc., 690 F. Supp. 2d 254, 269 (S.D.N.Y. 2010).

B.  Applying the *Moench* Presumption

We turn now to whether plaintiffs have pled facts sufficient to overcome the presumption of prudence and successfully alleged that the Investment and Administration Committees abused their discretion by allowing participants to continue to invest in

22

Citigroup stock. The Moench court, relying on trust law, explained that fiduciaries should override Plan terms requiring or strongly favoring investment in employer stock only when "owing to circumstances not known to the [plan] settlor and not anticipated by him," maintaining the investment in company stock "would defeat or substantially impair the accomplishment of the purposes of the [Plan]." 62 F.3d at 571 (quoting Restatement (Second) of Trusts § 227 cmt. g). We agree with this formulation and cannot imagine that an ESOP or EIAP settlor, mindful of the long-term horizon of retirement savings, would intend that fiduciaries divest from employer stock at the sign of any impending price decline. Rather, we believe that only circumstances placing the employer in a "dire situation" that was objectively unforeseeable by the settlor could require fiduciaries to override plan terms. Edgar, 503 F.3d at 348. The presumption is to serve as a "substantial shield," Kirschbaum, 526 F.3d at 256, that should protect fiduciaries from liability where "there is room for reasonable fiduciaries to disagree as to whether they are bound to divest from company stock," Quan, 623 F.3d at 882. The test of prudence is, as the dissent points out, one of conduct rather than results, and the abuse of discretion standard ensures that a fiduciary's conduct cannot be second-guessed so long as it is reasonable.

Although proof of the employer's impending collapse may not be required to establish liability, "[m]ere stock fluctuations,

23

even those that trend downhill significantly, are insufficient to establish the requisite imprudence to rebut the Moench presumption." Wright v. Or. Metallurgical Corp., 360 F.3d 1090, 1099 (9th Cir. 2004). We judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not "from the vantage point of hindsight." 29 U.S.C. § 1104(a)(1)(B) (establishing that the prudence of an ERISA fiduciary is to be measured in light of "the circumstances then prevailing"); Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (quoting Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)). We cannot rely, after the fact, on the magnitude of the decrease in the employer's stock price; rather, we must consider the extent to which plan fiduciaries at a given point in time reasonably could have predicted the outcome that followed.

Here, plaintiffs allege that Citigroup made ill-advised investments in the subprime-mortgage market while hiding the extent of those investments from Plan participants and the public. They also allege that, just prior to the start of the Class Period, Citigroup became aware of the impending collapse of the subprime market and that, ultimately, Citigroup reported losses of about $30 billion due to its subprime exposure. As a result, plaintiffs argue, Citigroup's stock price was "inflated" during the Class Period because the price did not reflect the company's true underlying value. Of course, as plaintiffs acknowledge,

these facts alone cannot sufficiently plead a fiduciary breach: that Citigroup made bad business decisions is insufficient to show that the company was in a "dire situation," much less that the Investment Committee or the Administration Committee knew or should have known that the situation was dire. Like the Fifth Circuit in Kirschbaum, we "cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions." See Kirschbaum, 526 F.3d at 256.

In an attempt to suggest the Investment and Administration Committees' knowledge of Citigroup's situation, plaintiffs allege in conclusory fashion that the Committee "knew or should have known about Citigroup's massive subprime exposure as a result of their responsibilities as fiduciaries of the Plans." Compl. ¶ 188. Plaintiffs add that, even if defendants were unaware of Citigroup's subprime exposure, they only lacked such knowledge because they "failed to conduct an appropriate investigation into whether Citigroup stock was a prudent investment for the Plans." Compl. ¶ 189.

Plaintiffs' allegations are insufficient to state a claim against the Investment and Administration Committees for breach of the duty of prudence. As an initial matter, plaintiffs' bald assertion, without any supporting allegations, that the Investment and Administration Committees knew about Citigroup's subprime

25

activities cannot support their claims. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions . . . ."). Moreover, that the fiduciaries allegedly failed to investigate the continued prudence of investing in Citigroup stock cannot alone rescue plaintiffs' claim; plaintiffs have not pled facts that, if proved, would show that such an investigation during the Class Period would have led defendants to conclude that Citigroup was no longer a prudent investment. As we noted above, plaintiffs must allege facts that, if proved, would show that an "adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." Kuper, 66 F.3d at 1460. This they have not done.

Additionally, even if we assume that an investigation would have revealed all of the facts that plaintiffs have alleged, the Investment and Administration Committees would not have been compelled to conclude that Citigroup was in a dire situation. While the Committee may have been able to uncover Citigroup's subprime investments, the facts alleged by plaintiffs, if proved, are not sufficient to support a conclusion that the Investment and Administration Committees could have foreseen that Citigroup would eventually lose tens of billions of dollars. And even if the Committee could have done so, it would not have been compelled to

26

find that Citigroup, with a market capitalization of almost $200 billion, was in a dire situation.  While fiduciaries' decisions are not to be judged in hindsight, we note for the record that during the Class Period, Citigroup's share price fell from $55.70 to $28.74, a drop of just over 50%.  Other courts have found plaintiffs unable to overcome the Moench presumption in the face of similar stock declines.  See Kirschbaum, 526 F.3d at 247 (40% drop); Edgar, 503 F.3d at 344 (25% drop); Kuper, 66 F.3d at 1451 (80% drop).

To summarize: plaintiffs fail to allege facts sufficient to show that defendants either knew or should have known that Citigroup was in the sort of dire situation that required them to override Plan terms in order to limit participants' investments in Citigroup stock.  Plaintiffs are therefore unable to state a claim for breach of ERISA's duty of prudence based on the inclusion of the Common Stock Fund in the Plans.

**II.  Communications Claim**

Plaintiffs allege in Count II of their complaint that the "Communications Defendants" (Citigroup, the Administration Committee, and Prince) breached their fiduciary duty of loyalty by (1) "failing to provide complete and accurate information regarding . . . Citigroup" and (2) "conveying through statements and omissions inaccurate material information regarding the soundness of Citigroup stock." Compl. ¶ 237.  We reject the first

27

theory of liability because fiduciaries have no duty to provide Plan participants with non-public information that could pertain to the expected performance of Plan investment options.  And we reject the second theory because there are no facts alleged that would, if proved, support a conclusion that defendants made statements, while acting in a fiduciary capacity, that they knew to be false.

A.   Duty to Provide Information

ERISA contains a "comprehensive set of 'reporting and disclosure' requirements."  Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995) (citing 29 U.S.C. §§ 1021-1031).  The statute, for example, requires plan administrators to "describ[e] the importance of diversifying the investment of retirement account assets," 29 U.S.C. § 1021(m)(2), and to inform participants "of the risk that holding more than 20 percent of a portfolio in the security of one entity (such as employer securities) may not be adequately diversified," id. § 1025(a)(2)(B)(ii)(II) (emphasis added).  Additionally, regulations in place during the Class Period required plan administrators, in certain circumstances, to provide plan participants with a "description of the investment alternatives available under the plan and, with respect to each designated investment alternative, a general description of the investment objectives and risk and return characteristics of each such alternative."  29 C.F.R. §

28

2550.404c-1(b)(2)(B)(1)(ii) (2009).

Plaintiffs do not allege any violations of these requirements. Nor could they support such a claim; the Plan documents informed plaintiffs that the Stock Fund invested only in Citigroup stock, which would be "retained in this fund regardless of market fluctuations," and that the Fund may "undergo large price declines in adverse markets," the risk of which "may be offset by owning other investments that follow different investment strategies."

Plaintiffs instead argue that defendants violated ERISA's more general duty of loyalty, 29 U.S.C. § 1104(a)(1), by failing to provide participants with information regarding the expected future performance of Citigroup stock. They rely on cases stating, in broad terms, that fiduciaries must disclose to participants information related to the participants' benefits. See, e.g., Dobson v. Hartford Fin. Servs. Grp., Inc., 389 F.3d 386, 401 (2d Cir. 2004) ("A number of authorities assert a plan fiduciary's obligation to disclose information that is material to beneficiaries' rights under a plan . . . .").

The cases cited by plaintiffs are inapposite for two reasons. First, in many of them, the court imposed a duty to inform at least in part because further information was necessary to correct a previous misstatement or to avoid misleading participants. See, e.g., Estate of Becker v. Eastman Kodak Co., 120 F.3d 5, 10 (2d

29

Cir. 1997) (relying in part on the "materially misleading information" provided by a "benefits counselor" to conclude "that Kodak breached its fiduciary duty to provide Becker with complete and accurate information about her retirement options"). Second, all of the cases cited by plaintiffs relate to administrative, not investment, matters such as participants' eligibility for defined benefits or the calculation of such benefits; none require plan fiduciaries to disclose nonpublic information regarding the expected performance of a plan investment option. See, e.g., Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 88-89 (2d Cir. 2001) (holding that an employer may be liable for misstatements or omissions about the availability of lifetime life insurance benefits); Estate of Becker, 120 F.3d at 9-10 (imposing liability based on an employer's providing misleading information about participants' eligibility for lump-sum retirement benefits).

We decline to broaden the application of these cases to create a duty to provide participants with nonpublic information pertaining to specific investment options.[4] ESOP fiduciaries do "not have a duty to give investment advice or to opine on the stock's condition." Edgar, 503 F.3d at 350 (internal quotation marks omitted). We agree with the district court that such a

---

[4] Although the dissent would hold that ERISA fiduciaries have an affirmative duty to disclose material information to plan participants, Judge Straub acknowledges that ERISA does not explicitly impose such a duty.

requirement would improperly "transform fiduciaries into investment advisors." In re Citigroup ERISA Litig., 2009 WL 2762708, at *22. Here, the Administration Committee provided adequate warning that the Stock Fund was an undiversified investment subject to volatility and that Plan participants would be well advised to diversify their retirement savings. Even assuming that they had the ability to do so, defendants had no duty to communicate a forecast as to when this volatility would manifest itself in a sharp decline in stock price.

B.   Misrepresentations

Plaintiffs next argue that, even if defendants had no affirmative duty to provide information regarding Plan investments, they nevertheless breached their duty of loyalty by making misrepresentations as to the expected performance of Citigroup stock. ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) (quoting 29 U.S.C. § 1104(a)(1)). Because "lying is inconsistent with the duty of loyalty," ERISA fiduciaries violate this duty when they "participate knowingly and significantly in deceiving a plan's beneficiaries." Id.; see also Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 66 (2d Cir. 2006).

Plaintiffs assert misrepresentation claims against Citigroup,

31

Prince, and the Administration Committee.  We hold that Citigroup and Prince were not acting in a fiduciary capacity when making the statements alleged in the complaint, and that the complaint does not adequately allege that the Administration Committee knew that it was making false or misleading statements.

### 1.    Citigroup and Prince

Plaintiffs allege that Citigroup and Prince "regularly communicated" with Plan participants about Citigroup's expected performance.  They argue that Citigroup and Prince may be held liable, under ERISA, for these communications because they "intentionally connected" their statements to Plan benefits.  This argument fails because neither Citigroup nor Prince was a Plan administrator responsible for communicating with Plan participants.  Therefore, neither acted as a Plan fiduciary when making the statements at issue.

Plaintiffs rely on the Supreme Court's decision in Varity Corp. v. Howe, 516 U.S. 489 (1996), in which the Court found an employer liable for misstatements made to plan participants in part because the employer "intentionally connected" its statements to "the future of [plan] benefits."  Id. at 505.  Plaintiffs, however, overlook that the employer in Varity was also the plan administrator, id. at 491, and that only the plan administrator is responsible for meeting ERISA's disclosure requirements and therefore for communicating with Plan participants.  29 U.S.C.

32

§ 1132(c).  That the employer in Varity "intentionally connected" its statements to plan benefits highlighted that it acted as a plan administrator and fiduciary – and not merely an employer – when making the statements in question.  Cf. Amato v. W. Union Int'l, 773 F.2d 1402, 1416-17 (2d Cir. 1985) (stating that an employer is only liable under ERISA for actions it takes while acting as an ERISA fiduciary), abrogated on other grounds by Mead Corp. v. Tilley, 490 U.S. 714, 721 (1989).  Here, Citigroup and Prince were not Plan administrators and were not responsible for communicating with Plan participants.[5]  Citigroup and Prince therefore spoke to Plan participants as employers and not as Plan fiduciaries.  They cannot be held liable, at least under ERISA, for any alleged misstatements made to Citigroup employees.

---

[5] The dissent contends that Citigroup and Prince acted as fiduciaries because they "intentionally connected" their statements about Citigroup's financial health and stock performance to the likely future of Plan benefits.  Dissent at [32] (quoting Varity, 516 U.S. at 505).  We disagree with the dissent's characterization of the facts alleged here.  The employer in Varity transferred all of its money-losing divisions into a newly created subsidiary that was destined to fail, and induced its employees to switch employers to the subsidiary by falsely assuring them that their benefits would remain secure.  516 U.S. at 492-94.  The parent corporation therefore "intentionally connected its statements about [the subsidiary's] financial health to statements it made about the future of benefits," which "in that context [was] an act of plan administration."  Id. at 505 (emphasis in original).  Plaintiffs, by contrast, allege only that Citigroup generally encouraged its employees – "and thus Plan participants" – to invest in Citigroup stock.  Compl. ¶ 198.  These allegations do not suggest the kind of intentional connection the Supreme Court relied on to find a fiduciary relationship in Varity.

33

## 2. Administration Committee

Plaintiffs also do not state a claim for relief based on alleged misstatements made by the Administration Committee because they have not adequately alleged that defendants made statements they knew to be false. Plaintiffs allege that both Plans' Summary Plan Descriptions (SPDs), distributed by the Administration Committee, "directed the Plans' participants to rely on Citigroup's filings with the SEC . . . , many of which . . . were materially false and misleading." Compl. ¶ 197. Plaintiffs state that the SEC filings all "failed to adequately inform participants of the true magnitude of the Company's involvement in subprime lending and other improper business practices . . . , and the risks these presented to the Company." Compl. ¶ 237.

A fiduciary, however, may only be held liable for misstatements when "the fiduciary knows those statements are false or lack a reasonable basis in fact." See Flanigan v. Gen. Elec. Co., 242 F.3d 78, 84 (2d Cir. 2001). Here, while plaintiffs conclude that the Committee members "knew or should have known about Citigroup's massive subprime exposure as a result of their responsibilities as fiduciaries of the Plans," Compl. ¶ 188, they have provided no specific allegations beyond this "naked assertion," Twombly, 550 U.S. at 557.

Plaintiffs are also unable to support their argument that the Administration Committee members should have known of the

34

misstatements because they should have performed an independent investigation of the accuracy of Citigroup's SEC filings. While we cannot rule out that such an investigation may be warranted in some cases, plaintiffs have not alleged facts that, without the benefit of hindsight, show that it was warranted here. Plaintiffs have not alleged that there were any "warning flags," specific to Citigroup, that triggered the need for an investigation. Rather, plaintiffs provide a list of publicly available articles and news reports that signaled potential trouble in the subprime market as a whole.

We are also mindful that requiring Plan fiduciaries to perform an independent investigation of SEC filings would increase the already-substantial burden borne by ERISA fiduciaries and would arguably contravene Congress's intent "to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." Conkright v. Frommert, 130 S. Ct. 1640, 1649 (2010) (quoting Varity, 516 U.S. at 497 (alterations in original)). Furthermore, we are hesitant to "run the risk of disturbing the carefully delineated corporate disclosure laws." Baker v. Kingsley, 387 F.3d 649, 662 (7th Cir. 2004). While we have the authority to create a "common law of rights and obligations" under ERISA, "the scope of permissible judicial innovation is narrower in areas where other federal actors are

35

engaged." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831-32 (2003) (internal quotation marks and citation omitted). Accordingly, while we intimate no view as to the possible investigatory responsibilities of other fiduciaries who are privy to additional "warning" signs or who are operating under substantially different circumstances, in the situation presented here we decline to hold that the Plan fiduciaries were required to perform an independent investigation of SEC filings before incorporating them into the SPDs.

**III.  Plaintiffs' Remaining Claims**

Plaintiffs also assert claims that (1) Citigroup and the Director Defendants failed to properly monitor their fiduciary co-defendants (Count III); (2) the same defendants failed to share information with their co-fiduciaries (Count IV); (3) all defendants breached their duty to avoid conflicts of interest (Count V); and (4) Citigroup, Citibank, and the Director Defendants are liable as co-fiduciaries (Count VI).  Plaintiffs do not contest that Counts III, IV, and VI cannot stand if plaintiffs fail to state a claim for relief on Counts I or II.  Accordingly, we affirm the district court's dismissal of these counts.

Count V appears to be based entirely on the fact that the compensation of some of the fiduciaries was tied to the performance of Citigroup stock and that Prince and Robert Rubin, another Director Defendant, sold some of their Citigroup stock

36

during the Class Period.  Plaintiffs do not allege any specific facts suggesting that defendants' investments in Citigroup stock prompted them to act against the interests of Plan participants. Under plaintiffs' reasoning, almost no corporate manager could ever serve as a fiduciary of his company's Plan.  There simply is no evidence that Congress intended such a severe interpretation of the duty of loyalty.  We agree with the many courts that have refused to hold that a conflict of interest claim can be based solely on the fact that an ERISA fiduciary's compensation was linked to the company's stock.  See, e.g., In re Polaroid ERISA Litig., 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005); In re Worldcom, Inc. ERISA Litig., 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003). Accordingly, we affirm the judgment of the district court insofar as it held that plaintiffs failed to state a claim for relief on Count V.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the district court's dismissal of plaintiffs' complaint.

37

STRAUB, *Circuit Judge*, concurring in part and dissenting in part:

The August 2007 collapse of the $2 trillion subprime[1] mortgage market unleashed "a global contagion,"[2] the virulence of which is well demonstrated by plaintiffs' allegations in this case.

Plaintiffs are current and former employees of Citigroup who invested years of savings in their employer's retirement Plans. They did so at the cajoling of Citigroup and the other named defendants, who, according to plaintiffs, repeatedly and materially misrepresented Citigroup's dismal financial outlook and its massive subprime exposure. Defendants allegedly knew or should have known that Citigroup stock was an imprudent investment, but nonetheless permitted and encouraged the Plans to hold and to acquire billions of dollars in Citigroup stock. As Citigroup's "dire financial condition was revealed," its price per share declined by over 74% in a little over one year—a loss in market value of over $200 billion. Compl. ¶ 175. According to plaintiffs, their retirement Plans suffered enormous losses during the relevant time period.

---

[1] To oversimplify, the subprime crisis may be summarized as follows. Beginning in approximately 2001, many mortgage lenders approved loans for borrowers who did not qualify for prime interest rates; many of these loans were "hybrid adjustable rate mortgages," which provided a fixed rate of interest for an introductory period, after which the rate would "balloon." Financial institutions packaged these mortgages into mortgage-backed securities, which were then sold to investors. By 2006, home prices began to drop while interest rates rose. As a result, many borrowers could neither pay their existing mortgages nor refinance at favorable rates. Delinquencies and foreclosures thus increased, and the value of mortgage-backed securities dropped precipitously. Banks and other investors that were overly exposed to such investments faced the threat of collapse. *See generally* Compl. ¶¶ 108-34, 189; MAJORITY STAFF OF THE JOINT ECONOMIC COMM. OF THE U.S. CONG., THE SUBPRIME LENDING CRISIS (2007), *available at* http://jec.senate.gov/archive/Documents/Reports/10.25.07OctoberSubprimeReport.pdf. *See also Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 710 (2d Cir. 2011).

[2] ANDREW ROSS SORKIN, TOO BIG TO FAIL 5 (2010).

Today's majority opinion ensures that such losses will go remediless. It thus represents both an alarming dilution of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and a windfall for fiduciaries, who may now avail themselves of the corporate benefits of employee stock ownership plans ("ESOPs") without being burdened by the costs of complying with the statutorily mandated obligation of prudence.

In affirming the District Court's dismissal of plaintiffs' Prudence Claim, the majority holds that defendants' decisions to invest in employer stock are entitled to a presumption of prudence. According to the majority, plaintiffs can overcome the presumption only through allegations, accepted as true, that would establish that the employer was in a "dire situation." Maj. Op. at **[23]** (internal quotations omitted). Such arbitrary line-drawing leaves employees wholly unprotected from fiduciaries' careless decisions to invest in employer securities so long as the employer's "situation" is just shy of "dire"—a standard that the majority neglects to define in any meaningful way. But the duty of prudence does not wax and wane depending on circumstance; ERISA fiduciaries must act prudently at all times, and those who are derelict must be subject to accountability. Because I find no justification for cloaking fiduciaries' investment decisions in a mantle of presumptive prudence, I must respectfully dissent.

The majority next affirms the District Court's dismissal of plaintiffs' Communication Claim. Because I find the Communication Claim to be adequately stated, I dissent from this holding as well.

The majority also affirms the dismissal of Counts III (failure to monitor), IV (failure to disclose information to co-fiduciaries), and VI (co-fiduciary liability) for the same reasons it affirmed the dismissal of the Prudence and Communication Claims. Because I conclude that

dismissal of the Prudence and Communication Claims was improper, I also dissent with respect to Counts III, IV, and VI.

Finally, the majority affirms the dismissal of Count V, in which plaintiffs allege that all defendants breached their duty to avoid conflicts of interest by receiving compensation tied to the performance of Citigroup stock. I agree that this claim was properly dismissed. I thus join the majority for this part of the opinion only.

### I. Prudence Claim

The majority affirms the District Court's dismissal of plaintiffs' Prudence Claim, in which plaintiffs allege (a) that the Investment Committee, the Administration Committee, Citigroup, and Citibank knew or should have known that Citigroup stock was an imprudent investment; and (b) that the foregoing defendants thus breached their fiduciary duties by, among other things, continuing to offer as an investment option the Citigroup Common Stock Fund (the "Fund"), which consisted mostly of Citigroup common stock.

I conclude that plaintiffs' allegations are sufficient to state a claim against the Investment and Administration Committees for breach of the duty of prudence. I thus respectfully dissent.

#### A. Moench-*Type Deference Should Not Apply*

The District Court concluded that defendants, in offering the Fund to Plan participants as an investment option, were entitled to a presumption that they did so prudently. *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *1, 15-19 (S.D.N.Y. Aug. 31, 2009). By upholding this ruling, the majority aligns our Court with those that have embraced the doctrine articulated in *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). *See, e.g.*, *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 881 (9th Cir. 2010); *Kirschbaum*

*v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008); *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995).

Because I find the underpinnings of the *Moench* presumption to be fundamentally unsound, I decline the invitation to adopt it as a rule of law in our Circuit. As a practical matter, *Moench*-type deference to the investment decisions of an ESOP fiduciary renders moot ERISA's "prudent man" standard of conduct, 29 U.S.C. § 1104(a)(1). Of course, policy concerns sometimes justify divergence between standards of conduct—in other words, how actors should conduct themselves—and standards of review—in other words, the manner in which courts evaluate whether challenged conduct gives rise to liability. But in my view, the policy concerns underlying the *Moench* decision warrant no such divergence. I would preserve the statutorily mandated standard of prudence by calling for plenary, rather than deferential, review of an ESOP fiduciary's investment decisions.

### *1. ERISA's Prudent Man Standard of Conduct*

ERISA was designed to ensure "the continued well-being and security of millions of employees and their dependents" through the regulation of employee benefit plans. *See* 29 U.S.C. § 1001(a). *See also Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996). The statute thus imposes stringent standards of conduct upon fiduciaries who oversee such plans. *See* 29 U.S.C. § 1001(b). Indeed, we have said that ERISA's fiduciary standards of conduct are "'the highest known to the law.'" *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir.), *cert. denied*, 459 U.S. 1069 (1982)). Of particular relevance here is the ERISA fiduciary's duty to act in accordance with the "prudent man" standard of conduct—that is, "with the care, skill, prudence, and diligence under the

-4-

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Although this standard is rooted in the common law of trusts, ERISA's standard is "more exacting." *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983).

ERISA allows for the creation of ESOPs, which are "designed to invest primarily in qualifying employer securities." 29 U.S.C. § 1107(d)(6)(A). To fulfill this purpose, ESOP fiduciaries are exempt from certain standards of conduct that apply to other kinds of ERISA plans. For example, although fiduciaries of pension benefit plans generally must diversify investments so as to minimize risk, *see id.* § 1104(a)(1)(C), ESOP fiduciaries need not do so. Specifically, section 404(a)(2) of ERISA provides that "the diversification requirement . . . and the prudence requirement (only to the extent that it requires diversification) . . . is not violated by acquisition or holding of . . . qualifying employer securities." *Id.* § 1104(a)(2). ESOP fiduciaries are also exempted from ERISA's prohibition against dealing with a party in interest. *Id.* § 1106(b)(1). But they are not otherwise excused from the stringent "prudent man" standard that governs fiduciary conduct under typical ERISA plans. *See, e.g.*, *Quan*, 623 F.3d at 878; *Moench*, 62 F.3d at 569; *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 955 (D.C. Cir. 1985).

### 2. *Policy Justifications for Deferential Standards of Review*

Whether a standard of *conduct*—such as ERISA's "prudent man" standard—is judicially enforced turns on the standard of *review* used to test the legality of the conduct at issue. In many contexts, the two standards are aligned. For instance, "the standard of conduct that governs automobile drivers is that they should drive carefully, and the standard of review in a liability claim against a driver is whether he drove carefully." Melvin Aron Eisenberg, *The Divergence*

*of Standards of Conduct and Standards of Review in Corporate Law*, 62 FORDHAM L. REV. 437, 437 (1993) (internal footnote omitted).  In such instances, the governing standard of conduct retains its bite.

In other areas of the law, however, "prudential judgment" counsels in favor of adopting a standard of review that is more lenient than the applicable standard of conduct.  *See id.*  Corporate law provides a useful example.  As a normative matter, directors of a corporation are generally expected to perform their functions in good faith, and with the degree of care that an ordinarily prudent person in a like position would use under similar circumstances.  *See, e.g.*, N.Y. BUS. CORP. LAW § 717(a).  This standard of conduct is "fairly demanding," but the standard of review used to test whether directors are liable for violating the duty of due care is "less stringent."  *See* Eisenberg, *supra*, at 441.  Under the business judgment rule, directors are entitled to a presumption that, in making a business decision, they acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.  *See, e.g.*, *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 52 (2d Cir. 2010).

Considerations of "fairness and policy" led to the adoption of this deferential standard.  Eisenberg, *supra*, at 443.  Business judgments are often "made on the basis of incomplete information and in the face of obvious risks."  *Id.* at 444.  A reasonableness standard of review could thus discourage directors from making "bold but desirable decisions," and might even deter directors from serving at all.  *Id.*  In addition, "courts are ill-equipped to determine after the fact whether a particular business decision was reasonable" under the circumstances.  William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due*

*Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. REV. 449, 452 (2002). Examining directors' decisions under a standard of review that is more lenient than the relevant standard of conduct thus "furthers important public policy values." *Id.* at 449.

### 3. *Policy Considerations Do Not Warrant Deferential Review of ESOP Fiduciaries' Investment Decisions*

I am not persuaded that considerations of public policy require *Moench*-type deference to the investment decisions of ESOP fiduciaries, which results in an emasculation of ERISA's "prudent man" standard of conduct.

### a. *The* Moench *Court's Policy Considerations*

The named plaintiff in *Moench* alleged that the fiduciaries of his ESOP breached ERISA standards of conduct by continuing to invest in employer stock despite the deterioration of the employer's financial condition. *See Moench*, 62 F.3d at 558-59. For our purposes, the issue in *Moench* was what standard of review is appropriate to test the fiduciaries' liability for their investment decisions. *See id.* at 568. *See also Edgar v. Avaya, Inc.*, 503 F.3d 340, 346 (3d Cir. 2007).

To answer this question, the *Moench* court first considered the special status of ESOPs under ERISA. *Moench*, 62 F.3d at 568. Specifically, the court noted that ESOP fiduciaries are exempt from ERISA's duty to diversify, and from the statute's prohibition against dealing with a party in interest. *Id.* (discussing the exemptions under 29 U.S.C. §§ 1104(a)(2) and 1108(b)(1).) The court explained that these exemptions "arise[ ] out of the nature and purpose of ESOPs themselves," *id.*, which is "to 'invest primarily in qualifying employer securities,'" *Edgar*, 503 F.3d at 346 (quoting 29 U.S.C. § 1107(d)(6)(A)). That ESOPs are undiversified means that they

-7-

place participants' retirement assets "at much greater risk" than other ERISA plans. *Moench*, 62 F.3d at 568 (internal quotations omitted). But Congress did not intend ESOPs to *guarantee* retirement benefits. *Id.* Rather, Congress intended that ESOPs would function as both employee retirement benefit plans and as a "technique of corporate finance that would encourage employee ownership." *Id.* at 569 (internal quotations omitted). Notwithstanding ESOPs' unique status, the *Moench* court emphasized that ESOP fiduciaries are still required to act in accordance with ERISA's standards of prudence and loyalty. *See Moench v. Robertson*, 62 F.3d 553, 569 (3d Cir. 1995)*; see also Edgar*, 503 F.3d at 346.

According to the *Moench* court, the appropriate standard of review was thus one that would preserve a balance between, on the one hand, the goals of ESOPs, and on the other, ERISA's stringent fiduciary duties. In short, the appropriate standard of review would ensure that "competent fiduciaries" would not be deterred from service, and "unscrupulous ones" would not be given "license to steal." *Moench*, 62 F.3d at 569 (internal quotations omitted).

The court rejected plenary review as destructive of such balancing. *See id.* at 570. The court reasoned that "strict judicial scrutiny" of fiduciaries' investment decisions "would render meaningless the ERISA provision excepting ESOPs from the duty to diversify." *Id.* In addition, the court feared that plenary review "would risk transforming ESOPs into ordinary pension benefit plans," which would frustrate Congress's desire to facilitate employee ownership. *Id.* "After all," the court asked, "why would an employer establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing?" *Id.* Finally, the court looked to the common law of trusts, which requires that interpretation of trust terms be controlled by the settlor's intent. *Id.* "That principle is not well served in the long run

by ignoring the general intent behind such plans in favor of giving beneficiaries the maximum opportunities to recover their losses." *Id.*

To fashion the appropriate standard of review, the court again found guidance in the common law of trusts. *See id.* at 571. According to *Moench*, where a trust instrument "requires" the trustee to invest in a particular stock, the trustee is generally "immune from judicial inquiry," *id.*, *see also Edgar*, 503 F.3d at 346, but where the instrument merely "permits" a particular investment, trust law calls for plenary review of the investment decision, *id.* The fiduciaries in *Moench* were not "required" to invest in employer securities, but they were "more than simply permitted to make such investments." *Moench*, 62 F.3d at 571. The court therefore determined that an "intermediate abuse of discretion standard would strike the appropriate balance between immunity from judicial review, at one extreme, and de novo review, at the other." *Edgar*, 503 F.3d at 347; *see also Moench*, 62 F.3d at 571 ("[T]he most logical result is that the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion.").

Pursuant to this deferential review, an ESOP fiduciary who invests plan assets in employer stock "is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities." *Moench*, 62 F.3d at 571. To do so, plaintiffs must show that the fiduciaries "could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." *Id.* Thus, plaintiffs may introduce evidence to the effect that, "owing to circumstances not known to the settlor and not anticipated by him," investing in

employer securities "would defeat or substantially impair the accomplishment of the purposes of the trust."[3]  *Id.* (internal quotations omitted).

#### b.      *The* Moench *Court's Policy Considerations Are Insufficient to Justify Adopting Deferential Review*

The question remains whether the policy concerns articulated in *Moench*—and reiterated by the majority here—warrant our adoption of a standard of review that is more lenient than ERISA's "prudent man" standard of conduct.  I answer that question in the negative.

#### i.      Moench *Deference Does Not Appropriately Balance ERISA's Competing Values*

In my view, the *Moench* presumption strikes no acceptable "accommodation," (Maj. Op. at **[19]**), between the competing ERISA values of protecting employees' retirement assets and encouraging investment in employer stock.  The majority favorably cites to decisions that note that the *Moench* presumption "would be difficult to rebut,"[4] and that refer to the presumption as a "substantial shield"[5] to fiduciary liability.  As these authorities implicitly acknowledge, the *Moench* presumption precludes, in the ordinary course, judicial enforcement of the prudent man standard of conduct.  In a case that was argued in tandem with the instant matter,[6] the Secretary of Labor noted that the *Moench* presumption relegates the duty of prudence to protecting employees only "from the complete loss of their assets in the wake of a company's collapse,"

---

[3]      The majority here states that "only circumstances placing the employer in a 'dire situation' that was objectively unforeseeable by the settlor could require fiduciaries to override plan terms."  Maj. Op. at **[23]** (quoting *Edgar*, 503 F.3d at 348).

[4]      *Quan v. Computer Scis. Corp.*, 623 F.3d 870, 883 (9th Cir. 2010).

[5]      *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008).

[6]      The Court decided the *Gearren* matter in a separate, *per curiam* opinion filed today.  *See Gearren v. McGraw-Hill Cos.*, No. 10-792-cv (2d Cir. **[DATE]**) (per curiam).

thereby "leaving them otherwise unprotected from the careless management of plan assets."

Brief for the Secretary of Labor as Amicus Curiae Supporting Plaintiffs-Appellants, *Gearren v. McGraw-Hill Cos.*, (2d Cir. June 4, 2010) (No. 10-792-cv), 2010 WL 2601687, at *20. This cannot be what Congress envisioned when it enacted ERISA. *Cf. ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 885 (2d Cir. 1988) (citing *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986) for the proposition that ERISA, as a remedial statute, "should be liberally construed in favor of protecting the participants in employee benefits plans" (internal quotations omitted)). "ERISA is paternalistic," *Van Boxel v. Journal Co. Emps.' Pension Trust*, 836 F.2d 1048, 1052 (7th Cir. 1987), and it is thus incongruous to deny participants meaningful judicial review on the theory that investment in employer stock should be encouraged.

The statutory structure further demonstrates the impropriety of *Moench*'s "accommodation." ESOPs are merely one type of benefit plan under the broader ERISA framework. That they are exempt from certain of ERISA's standards of conduct does not mean that the policies favoring ESOPs should override the policies of ERISA. Indeed, when a general statutory policy is qualified by an exception, courts generally read "'the exception narrowly in order to preserve the primary operation of the [policy].'" *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 97 (1993) (parenthetically quoting *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 739-40 (1989)). Accordingly, the investment decisions of ESOP fiduciaries must be "subject to the closest scrutiny under the prudent person rule, in spite of the strong policy and preference in favor of investment in employer stock." *Fink v. Nat'l Sav. & Trust Co.*, 772 F.2d 951, 955-56 (D.C. Cir. 1985) (internal quotations omitted); *see also Eaves*

-11-

*v. Penn*, 587 F.2d 453, 460 (10th Cir. 1978) ("ESOP fiduciaries are subject to the same fiduciary standards as any other fiduciary except to the extent that the standards require diversification of investments.").

Had Congress intended to accommodate ERISA's competing values by requiring deferential review of ESOP fiduciaries' decisions, it could have provided for that result. *See, e.g.*, 5 U.S.C. § 706(2)(A) (Administrative Procedure Act) (establishing a deferential standard of review over agency determinations).

### ii. *Plenary Review Would Not Deter ESOP Formation*

I further reject the *Moench* court's assertion, echoed by the majority here, that plenary review of a fiduciary's investment decisions would spell doomsday for the ESOP institution. *See Moench*, 62 F.3d at 570; Maj. Op. at **[20]**. ESOPs (under ERISA) had been in existence for more than twenty years before the Court of Appeals for the Third Circuit issued its decision in *Moench*. I have seen no evidence that plenary review during that time or thereafter[7] resulted in ESOP termination, or deterred ESOP formation. ESOP growth apparently slowed in the early 1990s. But commentators (including the ESOP Association, an amicus here) attribute the subsidence to legislative and market factors—not to fiduciaries' fears of being subjected to a particular brand of judicial review.[8]

---

[7]     *See, e.g.*, *Howard v. Shay*, 100 F.3d 1484, 1488-89 (9th Cir. 1996) (undertaking plenary review of ESOP fiduciary's conduct); *Eyler v. Comm'r of Internal Revenue*, 88 F.3d 445, 454-56 (7th Cir. 1996) (same); *Donovan v. Cunningham*, 716 F.2d 1455, 1473-74 (5th Cir. 1983) (same); *Burud v. Acme Elec. Co., Inc.*, 591 F. Supp. 238, 248 (D. Alaska 1984) ("There are no statutory or federal common law presumptions cloaking the fiduciary's act in prudence. To the contrary, ERISA invites the closest scrutiny of a trustee's action.").

[8]     *See, e.g.*, *ESOP Statistics*, ESOP ASSOCIATION, http://www.esopassociation.org/media/media_statistics.asp  (last visited Aug. 11, 2011) (noting

-12-

The *Moench* court questioned why an employer would "establish an ESOP if its compliance with the purpose and terms of the plan could subject it to strict judicial second-guessing[.]" *Moench v. Robertson*, 62 F.3d 553, 570 (3d Cir. 1995). But the incentives for ESOP creation are well documented. First, corporations often establish ESOPs to help raise funds, which can then be used, for example, to provide working capital or to buy out large shareholders. *See* Michael E. Murphy, *The ESOP at Thirty: A Democratic Perspective*, 41 WILLAMETTE L. REV. 655, 664 (2005). Second, ESOPs confer significant tax advantages on employers.[9] Third, employers use ESOPs to accomplish various business objectives, including management entrenchment (by placing large amounts of stock in friendly hands), and avoiding hostile takeovers (by purchasing publicly held shares of employer stock as a defensive measure). *See* Aditi Bagchi, *Varieties of Employee Ownership: Some Unintended Consequences of Corporate Law and Labor Law*, 10 U. PA. J. BUS. & EMP. L. 305, 317 (2008).

In light of these, and other incentives, some commentators note that ESOPs have "been used more to the advantage of the firm than its employees." *Id.* at 316 (internal quotations omitted). I thus find implausible the suggestion that plenary review of fiduciaries' investment decisions would suddenly deter ESOP formation or lead to widespread plan termination.

---

that the "rapid increase in new ESOPs in the late 1980s subsided after Congress removed certain tax incentives in 1989"); *see also* Michael E. Murphy, *The ESOP at Thirty: A Democratic Perspective*, 41 WILLAMETTE L. REV. 655, 661 n.42 (2005).

[9]     As the ESOP Association notes, "[t]he amounts which may be contributed to an ESOP on a tax-deductible basis are higher than the amounts which may be contributed to other kinds of defined contribution plans." Brief for the ESOP Association as Amicus Curiae Supporting Defendants-Appellees, at 8-9 n.5 (citing I.R.C. § 404(a)(9)). In addition, corporations that use ESOPs to obtain loans may take tax deductions with respect to both the interest *and* the principal payments on the loan. *Id.* (citing I.R.C. § 404(a)(3), (9)). Employers may also deduct certain dividends paid on ESOP stock. *See* I.R.C. § 404(k).

### iii. Plenary Review Would Not Render ESOP Fiduciaries "Guarantors"

I also disagree with the contention that plenary review of the prudence of fiduciaries' investment decisions would transform fiduciaries into "virtual guarantors of the financial success of the [ESOP]," *Moench*, 62 F.3d at 570 (alteration in original) (internal quotations omitted); *see also* Maj. Op. at **[20]** (stating that absent deferential review, "fiduciaries would be equally vulnerable to suit either for not selling if they adhered to the plan's terms and the company stock decreased in value, or for deviating from the plan by selling if the stock later increased in value").

The foregoing arguments misperceive the nature of the prudence inquiry, and the effect of plenary review. The test of prudence is one of *conduct*, not *results*. *See Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7-8 (1st Cir. 2009). Accordingly, whether a fiduciary acted prudently at the time he engaged in a challenged transaction turns on whether he "employed the appropriate methods to investigate the merits of the investment." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001) (internal quotations omitted). A fiduciary who discharges his duty of prudence will not be liable merely because the investment ultimately fails, *see DiFelice v. U.S. Airways Inc.*, 497 F.3d 410, 424 (4th Cir. 2007), just as a surgeon who abides by the applicable standard of care will not be liable in negligence merely because his patient expires on the operating table. In short, the duty of prudence—which is concerned with conduct—does not require a fiduciary to become a guarantor—who is concerned with results. *See DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990). Plenary review could not possibly alter that dichotomy, because the basis for liability is a breach of the duty of prudence, which is not a "guarantee but a standard of conduct that Congress imposed and that the fiduciary

-14-

can satisfy by acting reasonably." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 920 (8th Cir. 1994).

> ### iv. Plenary Review Would Not Render Meaningless ESOPs' Exemption From The Duty To Diversify

I further disagree with the contention that plenary review of fiduciaries' investment decisions would read the diversification exemption out of ERISA. *See Moench*, 62 F.3d at 570. As previously noted, ERISA provides that "the diversification requirement . . . and the prudence requirement *(only to the extent that it requires diversification)* . . . is not violated by acquisition or holding of . . . qualifying employer securities." 29 U.S.C. § 1104(a)(2) (emphasis added). The exemption thus allows ESOP fiduciaries to be "released from certain *per se* violations on investments in employer securities." *Eaves*, 587 F.2d at 459.

Of course, the absence of a general diversification duty from the ESOP setting does not eliminate fiduciaries' duty of prudence. *See* 29 U.S.C. § 1104(a)(2); *Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006). An ESOP fiduciary may invest plan assets in employer securities so long as it remains prudent to do so. *See id.* And plenary review of that question—*i.e.*, of the *prudence* of a fiduciary's investment decisions—simply has no impact on the continued viability of ESOPs' statutory exemption from *per se* liability for the failure to diversify. The Secretary of Labor, in her amicus brief, explains the distinction well:

> The plaintiffs here . . . do not base their claims on the failure to diversify holdings of an otherwise prudent investment. Instead, they assert that the market was being misled to overvalue the stock, and that the plan's fiduciaries continued to purchase and hold the stock anyway. Diversification is not the issue; it was imprudent for the fiduciaries to knowingly buy even a single share at an inflated price.

-15-

Brief for the Secretary of Labor as Amicus Curiae Supporting Plaintiffs-Appellants, *In re Citigroup ERISA Litig.*, (2d Cir. Dec. 28, 2009) (No. 09-3804-cv), 2009 WL 7768350, at \*15 n.2.

In other words, although in the ESOP context there is no duty to diversify *as such*, there is still a duty of prudence. "And in particular cases," the duty of prudence "might . . . become a duty to diversify, even though failure to diversify an ESOP's assets *is not imprudence per se*." *Steinman v. Hicks*, 352 F.3d 1101, 1106 (7th Cir. 2003) (emphasis added). Accordingly, whether courts evaluate the *prudence* of fiduciaries' conduct under plenary review does not endanger ESOPs' statutory exemption from *per se* liability for the failure to diversify.

### 4. Summary

In sum, I cannot join in the majority's adoption of the *Moench* presumption, which is premised on indefensible policy concerns, and which, contrary to the congressionally enacted purposes of the Employee Retirement Income Security Act, greatly imperils the security of employees' retirement incomes.

Because I decline to adopt the presumption, I need not opine on its application to this case. Instead, I would hold that the sufficiency of plaintiffs' Prudence Claim must be evaluated under plenary review. I now undertake that evaluation.

### B. The District Court Erred In Dismissing Plaintiffs' Prudence Claim

### 1. Applicable Law

To state a claim for breach of fiduciary duty under ERISA, plaintiffs must adequately allege that defendants were plan fiduciaries who, while acting in that capacity, engaged in conduct constituting a breach of fiduciary duty under ERISA. *See* 29 U.S.C. § 1109; *Pegram v.*

-16-

*Herdrich*, 530 U.S. 211, 222-24 (2000). I agree with the majority that plaintiffs sufficiently alleged that the Investment Committee and the Administration Committee were ERISA fiduciaries with respect to plaintiffs' ability to invest through the Plans in Citigroup stock. Accordingly, I turn now to whether plaintiffs' allegations, accepted as true, would render it plausible that these defendants, acting in their fiduciary capacities, breached any ERISA-imposed responsibilities, obligations or duties.

As previously noted, an ERISA fiduciary must discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

The court's task in evaluating fiduciary compliance with the prudent man standard is to inquire "whether the individual [fiduciary], at the time [he] engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Flanigan*, 242 F.3d at 86 (internal quotations omitted). The question is thus whether the fiduciary acted "reasonably" in light of the facts of which he knew or should have known at the time he engaged in the challenged transaction. *See Roth*, 16 F.3d at 920. "A [fiduciary] who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *Armstrong*, 446 F.3d at 734.

### 2. *Application of Law to Facts*

I would hold that plaintiffs have stated a claim against the Investment and Administration Committees for breach of the duty of prudence.

Plaintiffs' allegations, if true, render it plausible that the Investment and Administration Committees knew about Citigroup's massive subprime exposure. To see why this is so, we must briefly examine (a) plaintiffs' allegations regarding the responsibilities (and membership) of the Investment and Administration Committees, and (b) the broader context of the subprime crisis, as well as Citigroup's prominent role in it.

Pursuant to Plan documents, the Administration Committee was charged with managing the operation and administration of the Plans. The Plans also delegated to the Administration Committee the authority to impose certain restrictions on participants' investment selections. Meanwhile, the Plan documents charged the Investment Committee with, among other things, selecting and monitoring investment options for the Plans; it "had the discretion and authority to suspend, eliminate, or reduce any Plan investment, including investments in Citigroup stock." Compl. ¶ 69. Plaintiffs explicitly allege that the Investment Committee "regularly exercised its authority to suspend, eliminate, reduce, or restructure Plan investments." *Id*. Given plaintiffs' allegation that, as of 2008, Citigroup was the largest bank in the world in terms of revenue, we may reasonably infer (a) that Citigroup appointed relatively sophisticated businesspersons to staff the Investment Committee (as well as the Administration Committee); and (b) that such relatively sophisticated Investment Committee members would have had at least a basic knowledge of current events and market trends, especially insofar as they related to the selection and monitoring of Plan investments.

Plaintiffs' Complaint contains detailed allegations regarding the growth of subprime lending and Citigroup's ill-fated entry into the subprime marketplace. By 2006 and 2007, reports of an incipient subprime meltdown began to appear in the *Wall Street Journal*, the *New York*

-18-

*Times*, the *Financial Times*, *Bloomberg News*, and *Reuters*. *Id.* ¶ 189(a)-(y). Plaintiffs allege that the crisis was "foreseeable by at least the end of 2006, given the steady decline in the housing market, . . . the plethora of published reports by governmental agencies, real estate and mortgage industries, [and] the media at large." *Id.* ¶ 136.

Citigroup allegedly increased its activity in the subprime and securitization market in early 2005. By November 2007, its subprime exposure "amounted to a staggering $55 billion in at least one of its banking units—almost 30% of what the entire Company was worth at the time." *Id.* ¶ 134. According to plaintiffs, Citigroup reported subprime-related losses of $18.1 billion for the fourth quarter of 2007, and $7.5 billion for the first quarter of 2008. Plaintiffs allege that, as a result of Citigroup's "dire financial condition," its share price declined by over 74% between June 2007 and July 2008—a loss of over $200 billion in market value in a little over one year. *Id.* ¶ 175. The losses sustained during the Class Period of January 1, 2007 through January 15, 2008 allegedly "had an enormous impact on the value of participants' retirement assets," *id.* ¶ 238.

Such allegations support a reasonable inference that the relatively sophisticated members of the Investment Committee—by virtue of their responsibilities as fiduciaries of the Plans— would have had at least some awareness of both Citigroup's massive subprime exposure, and the growing potential for a market-wide crisis. That is, members of the Investment Committee were charged with selecting and monitoring Plan investment options, including Citigroup stock, which was the Plans' single largest asset.[10] It is thus reasonable to infer that in discharging their

---

[10] As of December 31, 2007—the day before the commencement of the Class Period—the Citigroup Plan held Citigroup common stock with a fair market value of approximately $2.14 billion; this represented approximately 19% of the total invested assets of the Citigroup Plan for

investment-related duties, Investment Committee members would have informed themselves of material information concerning Citigroup's business and operations that was relevant to the appropriateness of investing Plan assets in Citigroup stock. *See In re Coca-Cola Enters. Inc., ERISA Litig.*, No. 06 Civ. 0953, 2007 WL 1810211, at *14 (N.D. Ga. June 20, 2007) (ruling that complaint withstood dismissal where plaintiffs alleged that defendants were "senior" employees "who knew or should have known all material public and nonpublic information concerning [the employer's] business and operations that were relevant to the appropriateness of [the employer's] common stock as a Plan investment" (internal quotations omitted)); *In re Westar Energy, Inc., ERISA Litig.*, No. 03-4032, 2005 WL 2403832, at *25 (D. Kan. Sept. 29, 2005) (ruling that complaint withstood dismissal where plaintiffs alleged that "at least some of the Committee members knew or should have known [of alleged misrepresentations] *based on their status as officers in the Company*, and based on their own conduct" (emphasis added)).

The Complaint's well-pleaded allegations also support a reasonable inference that the Administration Committee knew of Citigroup's "dire financial condition," Compl. ¶ 175. At least one individual, Richard Tazik, apparently served on both the Investment Committee and the Administration Committee during the relevant time period. On the above analysis, it is at least plausible that Mr. Tazik, by virtue of his service on the Investment Committee, knew about Citigroup's subprime exposure. And because Mr. Tazik also allegedly served on the Administration Committee, it is plausible that at least one member of that Committee knew about it as well.

---

Plan year 2007. As of the same date, the Citibuilder Plan held Citigroup common stock with a fair market value of approximately $4.3 million; this represented approximately 32% of the total invested assets of the Citibuilder Plan for Plan year 2007.

If, in light of this knowledge, reasonably prudent fiduciaries would have taken "meaningful steps to protect the Plans' participants from the inevitable losses . . . [that] would ensue as [Citigroup's] non-disclosed material problems . . . became public," *id.* ¶ 228, then defendants may have acted imprudently.[11] That, however, is a fact-intensive inquiry ill-suited for resolution at the pleading stage. I would thus vacate the District Court's dismissal and remand for further proceedings.

## II.     Communications Claim

The majority also affirms the dismissal of plaintiffs' Communications Claim, in which plaintiffs allege that Citigroup, Prince and the Administration Committee breached their fiduciary duty of loyalty (a) by failing to provide complete and accurate information to Plan participants regarding Citigroup's financial condition, and (b) by conveying inaccurate, material information to Plan participants regarding the soundness of Citigroup stock.

For the reasons stated below, I conclude that the District Court should not have dismissed plaintiffs' Communications Claim. I thus respectfully dissent.

### A.     Duty to Disclose

In affirming the dismissal of plaintiffs' Communication Claim, the majority holds that ERISA fiduciaries have no duty to provide Plan participants with material information regarding the expected performance of Plan investment options. I find this conclusion to be contrary to the dictates of ERISA.

---

[11]     *See* 29 C.F.R. § 2550.404a-1(b)(1) (noting that the duty of prudence is satisfied if the fiduciary (i) "[h]as given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment . . . and (ii) [h]as acted accordingly.").

It is true that ERISA does not explicitly command fiduciaries to disclose such information, and the Supreme Court has not yet opined on whether the statute contemplates a duty to do so, *see Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996) (declining to reach the question). But in enacting ERISA, Congress did not attempt to "'explicitly enumerat[e] *all* of the powers and duties of [ERISA] fiduciaries.'" *Id.* at 496 (parenthetically quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)). Rather, Congress "'invoked the common law of trusts to define the general scope of [fiduciaries'] authority and responsibility.'" *Id.* Trust law is thus the "starting point" for our "effort to interpret ERISA's fiduciary duties," after which we "must go on to ask whether . . . the language of the statute, its structure, or its purposes require departing from common-law trust requirements." *Varity Corp.*, 516 U.S. at 497.

Pursuant to this approach, I conclude that ERISA fiduciaries "have an affirmative duty to disclose material information that plan participants need to know to adequately protect their interests," Brief for the Secretary of Labor as Amicus Curiae Supporting Plaintiffs-Appellants, *In re Citigroup ERISA Litig.*, (2d Cir. Dec. 28, 2009) (No. 09-3804-cv), 2009 WL 7768350, at *24.

Such a duty is firmly rooted in the common law of trusts. *See Glaziers & Glassworkers Union Local No. 252 Annuity Fund v. Newbridge Sec., Inc.*, 93 F.3d 1171, 1180 (3d Cir. 1996). Indeed, the "duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of Am.*, 919 F.2d 747, 750 (D.C. Cir. 1990). According to the Restatement of Trusts, the trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the

-22-

beneficiary needs to know for his protection in dealing with a third person."[12] REST. (SECOND) OF TRUSTS § 173, cmt. d. *See also, e.g.*, *Globe Woolen Co. v. Utica Gas & Elec. Co.*, 224 N.Y. 483, 489 (1918) (Cardozo, *J.*) ("A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word. . . . [A trustee] cannot rid himself of the duty to warn and to denounce, if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to his practised eye . . . ."). The duty to disclose thus entails "an affirmative duty to inform when the [fiduciary] knows that silence might be harmful." *Bixler v. Cent. Pa. Teamsters Health-Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir. 1993). It compensates for "the disparity of training and knowledge that potentially exists between a lay beneficiary and a trained fiduciary." *See id.*

Nothing in ERISA warrants a dilution of the common law requirements. In order to comport with the statutory duty of loyalty, an ERISA fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1), and for the "exclusive purpose" of "providing benefits to participants and their beneficiaries," *id.* § 1104(a)(1)(A). These provisions incorporate the fiduciary standards of the common law of trusts. *See, e.g.*, *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000); *Bixler*, 12 F.3d at 1300 (citing *Eddy*, 919 F.2d at 750). Yet, ERISA makes the common law requirements even "more exacting." *Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir. 1983); *see also Varity Corp.*, 516 U.S. at 497 ("ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory

_____

[12] And if a fiduciary is required to arm beneficiaries with sufficient information to deal with a "third person," the fiduciary is plainly required to provide sufficient information to allow the beneficiary to deal with the fiduciary himself. *See Glaziers & Glassworkers*, 93 F.3d at 1181 n.6.

-23-

protection."). Indeed, ERISA's legislative history indicates that Congress recognized the importance of disclosure, which it viewed as "a device to impart to employees sufficient information and data to enable them to know whether the plan was financially sound and being administered as intended. It was expected that the information disclosed would enable employees to police their plans." S. Rep. No. 93-127, at 27 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4863. I thus find no basis in ERISA for adopting a disclosure rule that affords beneficiaries *less* protection than they enjoyed at common law. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113-14 (1989).

In light of the stringent statutory duty of loyalty, our sister courts of appeals have recognized a duty to advise participants of circumstances that severely threaten plan assets, when fiduciaries have reason to know that their silence may be harmful. In *McDonald v. Provident Indemnity Life Insurance Co.*, for example, the Fifth Circuit held that the duty to disclose material information under such circumstances is an "obvious component" of ERISA's fiduciary duty provision. 60 F.3d 234, 237 (5th Cir. 1995). There, a trustee of a group health insurance plan failed to inform the plan sponsor—a small business owner—of a replacement insurer's new rate schedule, which set "prohibitive" premiums following the occurrence of a "single catastrophic claim." *Id.* at 237. When the business owner's dependent suffered a near-fatal accident, the insurer, over the course of one year, increased the company's premiums from $2000 per month to over $15,000 per month. *Id.* Unable to afford continued coverage, the company was forced to let the policy lapse. *Id.* The *McDonald* court concluded that information regarding the rate schedule was material due to the "impact" the schedule would have had on any small employer. *Id.* The trustee thus had a duty to disclose. *Id.* According to a subsequent

panel of the Court of Appeals for the Fifth Circuit, *McDonald* adopted a "case by case" approach in which the duty to disclose is triggered under "special circumstance[s]," such as when concealed information could cause an "extreme impact" to plan participants and beneficiaries. *Ehlmann v. Kaiser Found. Health Plan of Tex.*, 198 F.3d 552, 556 (5th Cir. 2000).

Other courts have recognized that a disclosure duty may arise under similar circumstances.[13] *See, e.g.*, *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 114-15 (1st Cir. 2002) (explaining that an affirmative duty to inform beneficiaries of material facts about the plan arises where "there was some particular reason that the fiduciary should have known that his failure to convey the information would be harmful" (citing *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 381-82 (4th Cir. 2001); *Barker v. Am. Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir. 1995); *Eddy*, 919 F.2d at 749)). *See also Pegram*, 530 U.S. at 227 n.8 (noting, in dictum, that "it could be argued that [an HMO] is a fiduciary insofar as it has discretionary authority to administer the plan, and so it is obligated to disclose characteristics of the plan and of those who provide services to the plan, *if that information affects beneficiaries' material interests*" (emphasis added)); *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 87 (2d Cir. 2001);

---

[13]     According to the majority, certain of these authorities are inapposite because they "relate to administrative, not investment, matters such as participants' eligibility for defined benefits or the calculation of such benefits." Maj. Op. at **[30]**.
     I am not persuaded.  The "benefit" in a defined contribution plan is "just whatever is in the retirement account when the employee retires." *Harzewski v. Guidant Corp.*, 489 F.3d 799, 804-05 (7th Cir. 2007).  The precise "benefit" at issue here may differ from those at issue in the above-mentioned authorities, but it is a "benefit" nonetheless.  That is why a breach of fiduciary duty that diminishes the value of the retirement account "gives rise to a claim for *benefits* measured by the difference between what the retirement account was worth when the employee retired and cashed it out and what it would have been worth then had it not been for the breach of fiduciary duty." *Id.* at 807 (emphasis added).

-25-

*Bixler*, 12 F.3d at 1300 (ruling that an affirmative disclosure duty arises "where the trustee knows that silence might be harmful"); *Glaziers & Glassworkers*, 93 F.3d at 1182 ("[A] fiduciary has a legal duty to disclose to the beneficiary only those material facts, known to the fiduciary but unknown to the beneficiary, which the beneficiary must know for its own protection. . . . The well established obligations endemic in the law of trusts requires nothing less."); *Acosta v. Pac. Enters.*, 950 F.2d 611, 618-19 (9th Cir. 1991) ("[A]n ERISA fiduciary has an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits.").

These authorities lead me to conclude that ERISA fiduciaries must disclose material information that plan participants reasonably need to know in order to adequately protect their retirement interests. I thus agree with those district courts that have found in ERISA's fiduciary provisions a duty to disclose material, adverse information regarding an employer's financial condition or its stock, where such information could materially and negatively affect the expected performance of plan investment options. *See, e.g.*, *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 478-79 (S.D.N.Y. 2005) (holding that plaintiffs stated a claim based on defendants' alleged failure "to keep Plan participants informed of material adverse developments" regarding the employer's deteriorating financial situation); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 562 (S.D. Tex. 2003) (holding that plaintiffs stated a claim based on defendants' alleged failure to disclose information about Enron's "dangerous financial condition" of which the defendants knew or should have known); *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 888 (S.D. Tex. 2004) ("[W]hen the . . . defendants distributed [materials] that encouraged plan participants to carefully review Dynegy's

SEC filings, they also triggered an affirmative duty to disclose material adverse information that the . . . defendants knew or should have known regarding the risks and appropriateness of investing in company stock." (citing *McDonald*, 60 F.3d at 237)).

The majority believes that such a duty would "improperly transform fiduciaries into investment advisors" by forcing them "to give investment advice or to opine on the stock's condition." Maj. Op. at **[31]** (quotations omitted). I disagree. Plaintiffs do not seek, and the duty to disclose would not compel, the provision of "investment advice" or "opinions" regarding corporate stock. Rather, the duty to disclose would merely ensure that, where retirement plan assets are severely threatened, employees receive complete, factual information such that they can make their own investment decisions on an informed basis. *See, e.g.*, *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 916 (E.D. Mich. 2004) (finding that plaintiffs had "not alleged that defendants had any duty to provide the participants with investment advice"; rather, plaintiffs' allegations "concern[ed] the fiduciary duties surrounding disclosure found in ERISA; i.e. that [defendants] could not mislead or fail to disclose information that they knew or should have known would be needed by participants to prevent losses").

I also take issue with the majority's conclusion that "the Administration Committee provided adequate warning that the Stock Fund was an undiversified investment subject to volatility and that Plan participants would be well advised to diversify their retirement savings," Maj. Op. at **[31]**. As a preliminary matter, whether information provided to participants was adequate to inform them of the risks of investing in employer stock is generally a "fact-intensive inquiry that must await a full factual record." *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 363 (S.D.N.Y. 2009) (quotations omitted). In any event, I fail to see how generalized

warnings concerning the inherent risks of undiversified investments could, as a matter of law, place lay beneficiaries on notice of the specific fiduciary misconduct alleged here. *See, e.g.*, *In re SunTrust Banks, Inc. ERISA Litig.*, 749 F. Supp. 2d 1365, 1377 (N.D. Ga. 2010) (ruling that boilerplate warning "cannot satisfy Defendants' duty to disclose material negative information to Plan Participants, particularly when, as Plaintiffs allege, Defendants were aware of the deteriorating nature of the Company and its Stock"); *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 865 (N.D. Ill. 2009) (explaining that fiduciaries do not discharge their duty by merely warning that a particular investment was the "riskiest" option; "the important question is whether [the fiduciaries] . . . withheld material information that plaintiffs needed to make an informed decision about their investment selections").

Where, as here, diversification is not "in the picture to buffer the risk to the beneficiaries should the company encounter adversity," fiduciaries must "be especially careful to do nothing to increase the risk faced by the participants still further." *See Armstrong v. LaSalle Bank Nat. Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006).

**B.** **Misrepresentations**

The majority also concludes that plaintiffs failed to state a claim for breach of the statutory duty of loyalty based on certain alleged misrepresentations made by Citigroup, Prince, and the Administration Committee. Specifically, the majority holds (1) that neither Citigroup nor Prince "acted as a Plan fiduciary when making the statements at issue," Maj. Op. at **[32]**; and (2) that plaintiffs alleged insufficient facts to demonstrate that the Administration Committee knew or should have known that its statements were false, Maj. Op. at **[34]**. I disagree with both holdings.

### 1. Plaintiffs Sufficiently Alleged that Citigroup and Prince Acted as ERISA Fiduciaries

"In every case charging breach of ERISA fiduciary duty," the threshold question is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); *see also Bell v. Pfizer, Inc.*, 626 F.3d 66, 73 (2d Cir. 2010) (citing *Pegram*). In pertinent part, section 3(21)(A) of ERISA states that a defendant "is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). This test is a functional one[14] that expands "the universe of persons subject to fiduciary duties." *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). As we have emphasized, Congress intended "that ERISA's definition of fiduciary be broadly construed." *Frommert v. Conkright*, 433 F.3d 254, 271 (2d Cir. 2006) (citing *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997)).

In accordance with the foregoing, the Supreme Court has held that a person may acquire status as an ERISA fiduciary by communicating to beneficiaries about the likely future of their plan benefits. *See Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996). The employer/plan administrator in *Varity* misrepresented the security of plaintiffs' non-pension benefits to induce them to transfer to a new subsidiary, which the employer had created for the purpose of placing its "money-losing eggs in one financially rickety basket." *Id.* at 493-94. The plaintiffs lost their benefits when the subsidiary went into receivership. *Id.* at 494. Their suit alleged that the employer's deception violated ERISA-imposed fiduciary obligations. *See id.* at 504.

---

[14] *See* 29 C.F.R. § 2509.75-8 (FR-16) ("The personal liability of a fiduciary who is not a named fiduciary is generally limited to the fiduciary functions, which he or she performs with respect to the plan.").

For our purposes, the issue in *Varity* was whether the employer was "acting in its capacity as an ERISA 'fiduciary' when it significantly and deliberately misled the [plaintiffs]." *Id.* at 491. The Court answered that question in the affirmative. Drawing on the common law of trusts, the Court concluded that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation," constitutes a discretionary act of plan "administration" within the meaning of section 3(21)(A). *Id.* at 502-03. The employer thus "was acting as a fiduciary (that is, was performing a fiduciary function)," *Pegram*, 530 U.S. at 226, when it misled the plaintiffs. The Court did not base its holding on the mere fact that the employer made statements about the subsidiary's expected financial condition, or on the mere fact that the employer's business decision turned out to have an adverse impact on the plan. *Varity*, 516 U.S. at 505. Rather, the determinative factor was that the employer "*intentionally* connected its statements about [the subsidiary's] financial health to statements it made about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading." *Id.* The Court emphasized that "making intentional representations about the future of plan benefits in that context *is an act of plan administration*" under section 3(21)(A). *Id.* (emphasis added).

In light of *Varity*, I conclude that plaintiffs have sufficiently alleged that Citigroup and Prince were acting as fiduciaries within the meaning of section 3(21)(A) when they made the misrepresentations here at issue. Plaintiffs allege that Citigroup and Prince were fiduciaries to the extent they exercised authority or responsibility over the "administration" of the Plans. Compl. ¶¶ 52, 61. This conclusion is supported with factual allegations which, if true, would

establish that Citigroup and Prince conveyed information—albeit misleading information—about the "likely" future of Plan benefits. *See Varity*, 516 U.S. at 504.

Specifically, plaintiffs allege that Citigroup and Prince "regularly communicated with . . . the Plans' participants[ ] about Citigroup's performance, future financial and business prospects, *and Citigroup stock, the single largest asset of [the] Plans*." Compl. ¶ 197 (emphasis added); *see also id.* ¶¶ 30, 48. These communications, which were directed to Plan participants in various writings and at mandatory town hall meetings, allegedly encouraged employees to invest in Citigroup stock through the Plans. According to plaintiffs, the communications fostered "an inaccurately rosy picture of the soundness of Citigroup stock as a Plan investment" by, among other things, failing to disclose "the significance and the risks posed by the Company's subprime exposure." *Id.* ¶¶ 199-200; *see also id.* ¶¶ 60 ("Prince made numerous statements, many of which were incomplete and inaccurate, to employees, and thus Plan participants, regarding the Company, and the future prospects of the Company specifically with regard to the risk, or purported lack thereof, faced by the Company as a result of its subprime exposure."), 133, 136, 191, 237. As a result, Citigroup and Prince allegedly "prevented the Plans' participants from appreciating the true risks presented by invest[ing] in Citigroup stock," and thus deprived participants of the opportunity to make informed investment decisions. *Id.* ¶ 199.

Accepting these allegations as true, and drawing all reasonable inferences in the plaintiffs' favor, I would hold that plaintiffs sufficiently alleged that Citigroup and Prince acted as fiduciaries within the meaning of section 3(21)(A) of ERISA. This is because plaintiffs' allegations, if true, would demonstrate that Citigroup and Prince "*intentionally* connected" their statements about the financial health of Citigroup and the performance of its stock to the likely

-31-

future of Plan benefits, such that their "intended communication about the security of benefits was materially misleading," *Varity*, 516 U.S. at 505. That is, plaintiffs sufficiently allege that Citigroup and Prince acted as fiduciaries because, under the circumstances, the making of intentional representations about the future of plan benefits "is an act of plan administration" within the meaning of ERISA. *See id.*

In holding that neither Citigroup nor Prince acted as a Plan fiduciary, the majority finds inapplicable the rule articulated in *Varity*. The majority observes that the employer in *Varity*— unlike Citigroup and Prince—*also* served as the designated plan administrator. According to the majority, then, *Varity* stands for the proposition that an employer may qualify as a fiduciary under the circumstances alleged here only if it is also the designated plan administrator.

I do not understand *Varity* or ERISA to impose such a formalistic limitation. As the Supreme Court has emphasized, ERISA provides that a person is a "fiduciary" not only if he is so named by a benefit plan, but also if he exercises discretionary authority over the plan's administration. *See Mertens*, 508 U.S. at 251 (citing 29 U.S.C. §§ 1102(a), 1002(21)(A)). In other words, ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of . . . authority over the plan." *Id.* at 262. As a result, persons other than designated plan administrators may, by performing an administrator-type function, acquire fiduciary status. The majority may be correct that Citigroup and Prince were not the *official* Plan administrators, and thus "were not [officially] *responsible* for communicating with Plan participants," Maj. Op. at **[33]** (emphasis added). But actors cannot take refuge from fiduciary status in official titles or responsibilities where their "*ultra vires*" conduct is fiduciary in nature. A rule to the contrary would create perverse incentives anathema to ERISA.

-32-

As I see it, the point in *Varity* is not that the designation of "plan administrator" is a prerequisite to fiduciary status. Instead, I view *Varity* as standing for the proposition that a person may act *as a fiduciary*—regardless of his official title—when he makes intentional representations about the future of plan benefits, because such conduct amounts to an act of plan "administration" within the meaning of section 3(21)(A). *See Varity*, 516 U.S. at 502-05. In short, the alleged misrepresentations at issue in *Varity* were actionable because they constituted *fiduciary acts* under ERISA's functional definition of "fiduciary"; whether the employer was also the designated plan administrator simply was not dispositive.

I am not alone in this view. *See, e.g.*, *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 454 n.2 (6th Cir. 2003) (citing *Varity*, and noting that "we have only recognized [fiduciary duty] claims when a plan administrator, *or an employer exercising discretionary authority in connection with the plan's management or administration* misrepresents a material fact" (internal quotations omitted) (emphasis added)); *Luckasevic v. World Kitchen, Inc.*, No. 06 Civ. 1629, 2007 WL 2683995, at *4 (W.D. Pa. Sept. 7, 2007) (rejecting defendants' claim that *Varity* is inapposite based on the "plan administrator" distinction, and noting that "the employer need not be the administrator to be deemed a fiduciary"); *Adamczyk v. Lever Bros. Co., Div. of Conopco*, 991 F. Supp. 931, 937-938, 938 (N.D. Ill. 1997) ("To the extent to which [communications] are related to plan administration, [they] trigger fiduciary duties on the part of the communicator, *regardless of his or her identity*. Even where an independent plan administrator has been appointed, it is entirely possible that it will be the employer that engages in such communications with the employees. Neither the statute nor the Supreme Court's

holding in *Varity* precludes the possibility that the employer acts as a fiduciary in such a case."

(emphasis added)).

### 2. *Plaintiffs Sufficiently Alleged That The Administration Committee Knowingly Made False Statements*

The majority also concludes that plaintiffs failed to adequately allege that the Administration Committee made statements it knew to be false. According to the majority, the Complaint contains only one, conclusory allegation on this front: that the Administration Committee members "'knew or should have known about Citigroup's massive subprime exposure as a result of their responsibilities as fiduciaries of the Plans,'" Maj. Op. at **[35]** (quoting Compl. ¶ 188). The majority holds that this "'naked assertion'" does not satisfy the plausibility standard mandated by *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Maj. Op. at **[35]** (quoting *Twombly*, 550 U.S. at 557).

I disagree. I find in the Complaint numerous and specific factual allegations which, if true, would support a reasonable inference that the Administration Committee knowingly made false statements to Plan participants.

Plaintiffs allege that the Administration Committee "regularly" provided "materially false and misleading" information to Plan participants about Citigroup's performance, future financial and business prospects, and its stock. Compl. ¶ 197. The Administration Committee allegedly conveyed such false information through newsletters, memos, Plan documents, and other related materials, as well as through the Plans' Summary Plan Descriptions, which incorporated by reference Citigroup's misleading filings with the Securities and Exchange Commission. *Id.* ¶¶ 67, 143 ("Citigroup did not disclose any subprime-related problems or the amount of its subprime-related loan loss exposure in its 2006 Form 10-K."), 197. According to plaintiffs,

-34-

these communications "fostered an inaccurately rosy picture of the soundness of Citigroup stock as a Plan investment," *id.* ¶ 199, because they failed to disclose the magnitude of Citigroup's "involvement in subprime lending and other improper business practices," *id.* ¶ 237.

As I discussed in the context of the Prudence Claim, plaintiffs' factual allegations support a reasonable inference that the members of the Investment Committee, by virtue of their fiduciary responsibilities, would have had at least some awareness of both Citigroup's massive subprime exposure, and the growing potential for a market-wide crisis. I also noted that, because one individual—Mr. Tazik—allegedly served on both the Investment and Administration Committees, it was plausible that at least one member of the Administration Committee was also aware of Citigroup's precarious financial position.

In the context of the instant claim, plaintiffs' allegations support a similar inference. Because, on the above analysis, it is plausible that at least some members of the Investment Committee knew of Citigroup's subprime exposure, we may reasonably infer that they would have known the falsity of SEC filings which misrepresented the extent of that exposure. And because Mr. Tazik allegedly served on both the Investment and the Administration Committees, it is reasonable to infer that he would thus have known of the falsity of the Summary Plan Descriptions, which incorporated Citigroup's misleading SEC filings. *See, e.g.*, *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 880-82 (S.D. Tex. 2004) (ruling that complaint withstood dismissal where defendants allegedly "knew or should have known by virtue of their positions in the [c]ompany and access to contradictory information . . . that the [Summary Plan Documents] contained affirmative, material misrepresentations" (internal quotations omitted)).

-35-

In light of the foregoing, I would hold that plaintiffs plausibly alleged that the misstatements here at issue were knowingly made by at least one member of the Administration Committee. Of course, the extent of that member's knowledge, or any other member's knowledge, is an evidentiary matter that cannot be resolved here. Accordingly, I would vacate the District Court's decision and remand for further proceedings.

*C.   Summary*

For the reasons stated above, I would vacate the District Court's dismissal with respect to both components of the Communication Claim, and remand for further proceedings.

*III.   Remaining Claims*

The majority affirms the dismissal of Counts III (failure to monitor), IV (failure to disclose information to co-fiduciaries), and VI (co-fiduciary liability) for the same reasons it affirmed the dismissal of Counts I and II. Because I conclude that dismissal of Counts I and II was improper, I would also vacate the dismissal of Counts II, IV and VI, and remand for further proceedings.

Finally, the majority affirms the dismissal of Count V, in which plaintiffs allege that all defendants breached their duty to avoid conflicts of interest by receiving stock-based compensation. I agree that this claim was properly dismissed. I thus join the majority for this part of the opinion only.

*   *   *

*Conclusion*

In sum, I would not adopt the *Moench* presumption of prudence, but would instead evaluate the prudence of ESOP fiduciaries' investment decisions under plenary review. Pursuant

-36-

to such a review, I would hold that plaintiffs' Prudence Claim withstands scrutiny under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  I would also hold that the District Court erred in dismissing plaintiffs' Communication Claim.  Accordingly, I would vacate the District Court's dismissal of the foregoing claims, as well as its dismissal of the secondary claims (Counts II, IV, and VI), and would remand for further proceedings.

Because I conclude that the majority properly affirmed the dismissal of Count V of plaintiffs' Complaint, I join that part of the majority's opinion.